AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

FILED
U.S. District Court
District of Kansas

for the

District of Kansas

SEP 2 7 2019

Clerk, U.S. District Court
By _____ Deputy Clerk

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

content of a blue Samsung cell phone found in bedroom
of Danny Del Real at 1207 W. Trail, Dodge City, Kansas

)
)
)
)
)
)

Case No.   19-6164 - GEB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*   See Attachment A.

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | possession with intent to distribute, or distribution of, controlled substances |
| 21 U.S.C. § 843 | unlawful use of a communication device in connection with drug trafficking |
| 21 U.S.C. § 846 | conspiracy to possess and/or distribute controlled substances |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jacob Seibel, Special Agent DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  27 Sept 19 @ 11:27 a.m

_____
*Judge's signature*

City and state:  Wichita, Kansas

Gwynne E. Birzer, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLUE SAMSUNG CELL PHONE FOUND IN 1207 W. TRAIL DODGE CITY, KANSAS | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Jacob Seibel, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device — located at 1207 W. Trail St. Dodge City, KS, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.      I have been a Special Agent with the DEA since 2018. I have received approximately 720 hours of specialized training at the DEA Academy, Quantico, Virginia, in conducting narcotics investigations, including drug interdiction, identification, smuggling, clandestine manufacture of drugs, methods of packaging, distribution of drugs, undercover operations, the laundering of drug proceeds, asset forfeiture, use of confidential sources, and the legal aspects of conducting drug investigations. Prior to my assignment with the DEA, I worked as a Police Officer for the City of Kansas City, Kansas, Police Department from approximately 2011 to 2018. As a Police Officer for the City of Kansas City, Kansas, I received approximately 1,040 hours of training at the Kansas City, Kansas Police Academy.

4.      During the course of my law enforcement career and employment with the DEA, I have participated in numerous surveillance operations including physical surveillance, wire surveillance, and electronic surveillance. I have also interviewed numerous confidential sources ("CSs"), cooperating witnesses ("CWs"), and defendants regarding various criminal activities, including narcotics trafficking. These interviews have included discussions of the use and meaning of code words to conceal criminal activity. I have testified at trial. I have

2

also written reports and analyzed records and documents. Through my assignment with the DEA, I have gained knowledge in the use of various investigative techniques, including the use of physical surveillance, undercover agents, confidential sources, cooperating witnesses, controlled purchases of illegal narcotics, electronic surveillance (to include T-III operations), consensually monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, grand jury subpoenas, and the execution of federal search and arrest warrants. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the Controlled Substances Act, including Title 21, United States Code, sections 841 (Possession with Intent to Distribute, and Distribution of, Controlled

3

Substances), 843 (Unlawful Use of a Communication Device in Connection with Drug Trafficking), and 846 (Conspiracy to Possess and to Distribute Controlled Substances) have been and are being committed by Danny DEL REAL and others.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.    The property to be searched is a cell phone located on the floor of Danny DEL REAL's bedroom at 1207 W. Trail St. Dodge City, KS and hereinafter referred to as the "Device." The Device is a black Samsung telephone in a blue case. The back cover of the phone, which usually contains identifying information, had been removed. Investigators suspect the Device is assigned phone number 620-253-9565 and has been used to further drug trafficking. It will be necessary for investigators to open the Device to verify the phone number and IMEI.

8.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment

### PROBABLE CAUSE

9.    On September 11, 2018, investigators from the Dodge City Police Department began an investigation into Danny DEL REAL distributing large amounts of methamphetamine in the Dodge City, Kansas area. Dodge City Police Department (DCPD) Detective

4

James Thompson and other law enforcement officials executed a
search warrant in the Dodge City area and seized approximately
seven ounces of methamphetamine from CS #1. Investigators had
completed multiple controlled purchases of methamphetamine from
CS #1 prior to the search warrant. During an interview of CS #1,
investigators learned that Danny DEL REAL was the suspect's
source of supply. CS #1 was signed up as a DCPD confidential
informant.

10.     CS #1 stated that s/he had purchased methamphetamine
from DEL REAL on multiple occasions and stated s/he would speak
with DEL REAL in person to arrange narcotics purchases. CS #1
gave investigators the phone number of 620-253-9565 for DEL REAL
which is subscribed to Monica DEL REAL and utilized by Danny DEL
REAL. This number matched the number displayed on DEL REAL's
business card for Import Automotive located at 100 N. Second
Dodge City, Kansas. A business card for DEL REAL was located in
CS #1's residence in a box where approximately one ounce of
methamphetamine was seized during the search warrant. Per the
Secretary of State of Kansas database, Danny DEL REAL owns
Import Automotive.

11.     On September 13, 2018, at the direction of
investigators, CS #1 attempted a controlled purchase of
methamphetamine from DEL REAL at Import Automotive located at

5

100 N. 2nd. Street, Dodge City, Kansas. During that attempted buy, DEL REAL told CS#1 the methamphetamine was on the way but he (DEL REAL) did not have any to sell. During the meeting, investigators heard DEL REAL, via audio surveillance, using 620-253-9565 to make multiple outgoing phone calls. None of the calls were answered and DEL REAL received a voicemail recording from the person he tried to call. Det. Thompson recorded the time DEL REAL attempted to make the phone calls. Investigators conducted Toll analysis based on the times of those calls. Tolls confirmed that DEL REAL utilized 620-253-9565 to dial 323-698-4698 twice at 11:31am and again at 11:33 am. These times are consistent with the audio and video recording. Investigators would later confirm GA utilized phone number 323-698-4698 and believe GA was transporting methamphetamine for DEL REAL. DEL REAL told CS# 1 that he would call him/her when the methamphetamine arrives and that he expected the drugs to be delivered sometime on September 14, 2018. CS #1 told Det. Thompson DEL REAL was attempting to check on the status of a methamphetamine shipment when he made the above phone calls. Toll analysis showed an incoming call from 323-698-4698 to 620-253-9565 at 3:35 pm on September 13, 2019 which had a duration of one minute and one second.

6

12.    On September 17, 2018, CS #1 met with law enforcement officials in a predetermined location in preparation for a controlled purchase of methamphetamine from DEL REAL in Dodge City, Kansas. CS #1 and his/her vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $2,400.00 in U.S. currency to purchase eight ounces of methamphetamine. CS #1 was given a covert recording device. CS #1 drove to Import Automotive where he was advised by an unknown male that DEL REAL was not there yet. CS #1 called 620-253-9565 which Danny DEL REAL answered and stated that he was on his way. Upon DEL REAL's arrival, CS #1 went inside Import Automotive with DEL REAL. CS #1 gave DEL REAL the $2,400.00 and DEL REAL gave CS #1 approximately eight ounces of methamphetamine. CS #1 was advised that s/he still owed DEL REAL $400.00 for the eight ounces. It was agreed that CS #1 could pay DEL REAL the additional $400.00 at a later time. Surveillance units followed CS #1 to and from the controlled buy and monitored the transaction via an electronic recording device. Following the controlled buy, CS #1 gave Det. Thompson a plastic bag containing the methamphetamine purchased from DEL REAL. CS #1 and his/her vehicle were searched again for additional contraband and large amounts of currency and again none were

found. A KBI lab analysis of the substance confirmed the presence of methamphetamine.

13.     TFO Maria Heimerman translated the call CS #1 placed to DEL REAL on 620-253-9565 into English. The following is a transcript of the call:

1)   PHONE RINGING

2)   CS #1 – Hello.

3)   DEL REAL – What's up?

4)   CS #1 – I am here waiting for you.

5)   DEL REAL – I am here at Dillon's and you?

6)   CS #1 – Here at the lot.

7)   DEL REAL – Okay I have to stop by the house then I will be there.

8)   CS #1 – Okay I will see you here, okay.

9)   HANGS UP PHONE.

14. CS #1 called DEL REAL to advise him that he was at Import Automotive. DEL REAL acknowledged CS #1 was waiting for him. CS #1 had previously arranged to meet DEL REAL so CS #1 could purchase methamphetamine from him under the direction of

8

law enforcement. DEL REAL used 620-253-9565 to confirm the meeting and tell CS #1 he was on his way.

15.     On October 15, 2018, CS #1 met with investigators in a predetermined location in preparation for another controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $3,200.00 in U.S. currency to purchase a ½ pound of methamphetamine for $2,800.00 and pay the additional $400.00 for the methamphetamine that was fronted to CS #1 during the previous controlled purchase. CS #1 was given an electronic recording device. CS #1 was followed by investigators to Import Automotive where s/he met with DEL REAL in the office. DEL REAL informed CS #1 that someone had installed a camera on a pole and he thought the business was being watched. DEL REAL told CS #1 that he did not want to complete the transaction at the shop but discussed ways to complete the controlled purchase of methamphetamine. DEL REAL told CS #1 that he was out of methamphetamine but expected a shipment to arrive that evening or the next morning and that the shipment was currently near Flagstaff Arizona. CS #1 returned to the predetermined location and met with investigators. CS #1 and CS #1's vehicle were searched again for contraband and large

9

amounts of currency and again none were found. CS #1 returned the $3,200.00 to investigators.

16.     On October 17, 2018, CS #1 met with investigators in a predetermined location in preparation for another controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $3,200.00 in U.S. currency to purchase a ½ pound of methamphetamine for $2,800.00 and pay the additional $400.00 for the methamphetamine that was fronted to CS #1 on the previous controlled purchase. CS #1 was given an electronic recording device. CS #1 was followed to Import Automotive by investigators. CS #1 met with DEL REAL in the office of Import Automotive. DEL REAL told CS #1 the methamphetamine had not arrived yet. CS #1 paid DEL REAL $400.00 for the previous ½ pound purchase. Before CS #1 left Import Automotive, DEL REAL made a phone call and spoke with someone. After the phone call, DEL REAL told CS #1 that he would save a pound of methamphetamine for him/her when the shipment arrived. DEL REAL told CS #1 that he would call when the methamphetamine was ready to purchase. CS #1 was followed back to a predetermined location by investigators. CS #1 and the CS #1's vehicle were again searched for contraband and large

amounts of currency and again none were found. CS #1 returned $2,800 in U.S. currency to investigators.

17.     On October 18, 2018, CS #1 met with investigators in a predetermined location in preparation for another controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $2,800.00 in U.S. currency to purchase one pound of methamphetamine, paying for half of it up front. CS #1 was provided with an electronic recording device. CS #1 was followed to Import Automotive by investigators. CS #1 met with DEL REAL at Import Automotive and again DEL REAL stated he did not have the methamphetamine. Before CS #1 left Import Automotive, DEL REAL made a phone call and was heard talking to an unidentified male in Spanish on speakerphone. A translated transcript is set forth below. CS #1 left Import Automotive and was followed back to a predetermined location by investigators. CS #1 and the CS #1's vehicle were searched again for contraband and large amounts of currency and again none were found. CS #1 returned the U.S. currency to investigators. CS #1 stated that DEL REAL made a phone call to check on the status of a methamphetamine shipment DEL REAL was expecting. Det. Thompson listened to CS#1's recording of the phone call between DEL REAL and the

11

unidentified male and recognized the voice of the person Danny DEL REAL was talking to on speaker phone as GA. Det. Thompson recognized GA's voice based on a voice comparison with other recordings of GA. Toll analysis conducted by Det. Thompson of phone calls placed by DEL REAL utilizing 620-253-9565 during the attempted controlled purchase revealed the phone number DEL REAL dialed was 323-698-4698. 323-698-4698 is subscribed to BLV and is believed to be utilized by GA. Based on GA using a phone subscribed to BLV to discuss methamphetamine shipments and a van registered to BLV being documented in Arizona on tag readers, your Affiant believes GA is a source of supply for DEL REAL. TFO Maria Heimerman translated the phone call DEL REAL made during the attempted controlled purchase into English. The following is a transcript from the phone call placed by DEL REAL utilizing 620-253-9565.

1)      CS #1- Unitelligible

2)      DEL REAL- Unintelligible

3)      CS #1 – Unintelligible

4)      DEL REAL – Unintelligible

5)    Unidentified Male #1 (UM #1) – What's up my friend?

6)      DEL REAL – That's your friend.

12

7)      UM #1 - How you doing?

8)      DEL REAL - $6,400 too much.

9)      UM #1 - Too much

10)     DEL REAL - Too much money man, I didn't buy it.

11)     UM #1 - You didn't buy it?

12)     DEL REAL - No, too much.

13)     UM #1 - It's dope.

14)     DEL REAL - Yeah no good, too much.

15)     CS #1 - What do our friends say?

16)     DEL REAL - They are still over there.

17)     CS #1 - They didn't leave? Then why did they say..

18)     DEL REAL - Too much partying dude let me call
        this guy.

19)     DEL REAL - Nah too much man.

20)     UM #1 - No good man.

21)     DEL REAL - Maybe $8,000.

22)     UM #1 - Yeah.

23)     DEL REAL – Too much.

24)     PHONE RINGING

25)     GA – Unintelligible.

26)     DEL REAL – Unintelligible…..Hey what's up then?

27)     GA – What's up?

28)     DEL REAL – What, what are you going to do or what?

29)     GA – Did you talk to_____? (Possibly Ruben)

30)     DEL REAL – Yes.

31)     GA – What does he say?

32)     DEL REAL – Well he says that he is going to call you
        or they are going to call      him and I don't know
        what else the same ….

33)     GA – But it's going to happen or not?

34)     DEL REAL – Well he says that it is but I don't know.

35)     GA – Maybe with this other guy,

36)     DEL REAL – What.

37)     GA – I already tried it and its badass dude.

38)     DEL REAL – The other guy?

14

39)  GA – I bought that shit and I bought forty dollars and
     was like "Chavo del Ocho" (Character on TV) A Chavo
     del Ocho cost forty bucks.

40)  DEL REAL – It's because this guy's said he already had
     them there but who knows.

41)  GA – Well I don't uh…know but I told you dude where
     you are buying it may not be good dude. You might be
     wasting your money dude.

42)  DEL REAL – You have a shit ton of time there.

43)  GA – Yea dude.

44)  DEL REAL – You have been there a long time there dude.

45)  GA – Yea dude, unintelligible. I have paid a lot
     and from here on out………unintelligible.

46)  DEL REAL – Yeah.

47)  GA – Unintelligible.

48)  DEL REAL – Yeah well this one says that.

49)  GA – Or he can't do it anymore? Unintelligible………….and
     he/she is mad      dude…unintelligible ………I think I am
     going to      pay_____do you understand me
     dude?

15

50)   DEL REAL - Yeah it's just that job was about two days
      ago.

51)   GA - Yeah dude you're going to
      lose………..unintelligible.

52)   DEL REAL - Yeah, and he hasn't called you?

53)   GA - Uh he called me in the morning…like at 1 and
      wanted to know that I was sure.

54)   DEL REAL - At 1?

55)   GA - Yeah.

56)   DEL REAL - Well if he arrives at 1 and nothing happens
      then there is no problem.

57)   GA - No, no unintelligible I am not going to kiss his
      ass…………unintelligible if he can't do it now then
      unintelligible…..then don't call me anymore dude.

58)   DEL REAL - No that is true no bullshit.

59)   GA - That's it.

60)   DEL REAL - It's not like he is close, he is 18 hours
      from here.

61)   GA - Yeah he is far…..unintelligible.

16

62)   DEL REAL — Hell yeah.

63)   GA - And uh like I told you dude, this
      dude…………..unintelligible………………….. it's a lot better
      dude.

64)   DEL REAL - Yeah well however you decide to do it. I
      will wait until after 1 and see what they do.

65)   GA - No if it's after 1 dude there are problems  dude.
      I will try uh I will try to uh get you two for five.

66)   DEL REAL — Yeah.

67)   GA — Two for five dude, that's good.

68)   DEL REAL — With the other?

69)   GA — Yeah dude. Two for five…..unintelligible.

70)   DEL REAL — Oh shit.

71)   GA — Cheap break.

72)   DEL REAL — Unintelligible.

73)   GA — That's it I called him dude. Uh he's down
      unintelligible he don't work till 1'oclock I'll tell
      him to put them to the side if you want them dude.

17

74)   DEL REAL - Yeah let me see what happens after 1 and I
      will let you know.

75)   GA - Unintelligible.........I am going to tell you the truth
      dude I can get the cash dude...unintelligible.

76)   DEL REAL - Yeah.

77)   GA - I will call you in a little.

78)   DEL REAL - Okay.

79)   PHONE HANGS UP

80)   DEL REAL - Unintelligible.

81)   CS #1 - So nothing yet?

82)   DEL REAL - Well at one....

83)   CS #1 - But they are far still.

84)   DEL REAL - Unintelligible. 18 hours.

85)   CS #1 - Hmmmmm

86)   DEL REAL - What do you think?

87)   CS #1 - Do you know anyone that can get some?

88)   DEL REAL - Nothing.

89)   CS #1 - Unintelligible.

90)   DEL REAL – No shit, what do we do?

91)   (CONVERSATION WITH POSSIBLE CUSTOMER)

92)   CS #1 – And what do you think when do you think the
      work will leave?

93)   DEL REAL – I don't know, as soon as they get there
      shit together.

94)   CS #1 – Do you have to go to New Mexico?

95)   DEL REAL – What, uh Monday.

96)   CS #1 – Monday? No well that is on the other side. And
      why couldn't they leave?

97)   DEL REAL – Because the other guy that was going to
      give it to them didn't give it to them.

98)   CS #1 – Oh.

99)   DEL REAL – And the one guy is in California and
      unintelligible………….just my nerves.

100)  CS #1 – And the two that you had you sold.

101)  DEL REAL – No ………unintelligible took them out. I don't
      know _____unintelligible no one has
      unintelligible.

102) CS #1 — So we have to wait? Hmmm I have to go to work
     at 1pm.

103) DEL REAL — Unintelligible.

104) CS #1 - Yes, they want some but there isn't any, and I
     told them today.

105) DEL REAL - Yeah, the same. (DEL REAL is on the phone
     with someone and told him/her to wait until 1) Tell
     that guy that he is a fucking rat and if he doesn't
     show up by 1 to fuck off.

106) DEL REAL continues talking to person on cell phone.

18.    During the call, DEL REAL says "Well he says that he
is going to call you or they are going to call him and I don't
know what else the same…." Your Affiant believes DEL REAL is
talking about a source of supply that is going to contact GA. GA
states "But it's going to happen or not?" and DEL REAL replied
"Well he says that it is but I don't know." Your Affiant
believes DEL REAL and GA are talking about GA meeting with a
source of supply to purchase methamphetamine. GA states "Maybe
with this other guy" to which DEL REAL replies "What." GA
continued "I already tried it and its badass dude." DEL REAL
replied "The other guy?" and GA said "I bought that shit and I

bought forty dollars and was like "Chavo del Ocho" (Character on TV) A Chavo del Ocho cost forty bucks." Your Affiant believes GA and DEL REAL are discussing a different methamphetamine source of supply they are considering switching to. Your Affiant believes GA was also talking about a sample of the methamphetamine he purchased for forty dollars and tried. DEL REAL stated "It's because this guy's said he already had them there but who knows." Your Affiant believes DEL REAL is talking about the source of supply he has been in contact with having the methamphetamine on hand. GA stated "Well I don't uh…know but I told you dude where you are buying it may not be good dude. You might be wasting your money dude." Your Affiant believes GA is telling DEL REAL the methamphetamine he has been purchasing may be no good and DEL REAL may be wasting his money by purchasing it. GA stated "And uh like I told you dude, this dude…………..unintelligible……………….. it's a lot better dude." DEL REAL replied "Yeah well however you decide to do it. I will wait until after 1 and see what they do. "GA Stated "No if it's after 1 dude there are problems dude. I will try uh I will try to uh get you two for five." DEL REAL stated "Yeah." GA stated "Two for five dude, that's good" and DEL REAL replied "With the other?" GA stated "Yeah dude. Two for five…..unintelligible" and DEL REAL replied "Oh shit." GA replied "Cheap break." Your

Affiant believes GA is telling DEL REAL that he can get two pounds of methamphetamine for five thousand dollars and it is higher quality than what DEL REAL is currently purchasing. GA expressed he would be upset if the methamphetamine he was waiting on did not arrive by one o' clock.

19.    On October 22, 2018, CS #1 met with investigators in a predetermined location in preparation for another controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $5,000.00 in U.S. currency to purchase one pound of methamphetamine. CS #1 was provided an electronic recording device. DEL REAL had previously instructed CS #1 to meet at 1207 W. Trail Street Dodge City, Kansas, which is known to be Danny DEL REAL's residence. Investigators followed CS #1 to 1207 W. Trail Street Dodge City, Kansas. CS #1 went into the residence and met with DEL REAL. DEL REAL moved methamphetamine from one plastic bag to another and weighed it on an electronic scale. CS #1 gave DEL REAL U.S. currency which he counted. DEL REAL took the money and gave CS #1 the methamphetamine. CS #1 exited the residence and proceeded to a predetermined location while being followed by investigators. CS #1 gave investigators the methamphetamine. CS #1 and CS #1's vehicle were searched again for contraband and

22

large amounts of currency and again none were found. The
methamphetamine weighed approximately one pound. A KBI lab
report confirmed the presence of methamphetamine in the
methamphetamine DEL REAL gave to CS #1. A photo of CS #1's call
log on October 22, 2018 showed that CS #1 communicated with DEL
REAL on 620-253-9565 prior to the controlled purchase.

20.    On November 19, 2018, CS #1 met with investigators
in a predetermined location in preparation for another
controlled purchase of methamphetamine from Danny DEL REAL. CS
#1 and CS #1's vehicle were searched for contraband and large
amounts of currency and none were found. CS #1 was provided with
$5,000.00 in U.S. currency to purchase one pound of
methamphetamine. Investigators followed CS #1 to DEL REAL's
residence located at 1207 W. Trail Street Dodge City, Kansas. CS
#1 went into the residence and met with DEL REAL. CS #1 observed
suspected marijuana and cocaine in addition to the
methamphetamine s/he was purchasing from DEL REAL. DEL REAL
placed the methamphetamine in a trash bag and gave it to CS #1.
CS #1 gave DEL REAL the $5,000.00 in U.S. currency. CS #1 left
the residence and was followed by investigators back to a
predetermined location. CS #1 and CS #1's vehicle were searched
again for contraband and large amounts of currency and again
none were found. CS #1 showed investigators a text conversation

23

that took place between Danny DEL REAL utilizing 620-253-9565
and CS #1. On November 16, 2018, DEL REAL texted CS #1 "ya ta
listo el caro si quiere venir" which translates "the car is
ready if you want to come." On November 18, 2018, CS #1 texted
DEL REAL "Ay le caigo Manana como a las 10:00 en su casa esta
bien" which translates "I will show up tomorrow around 10:00 at
you house if that's ok." On November 19, 2018, DEL REAL texted
CS #1 "aqui estoy" which translates "I am here." CS #1 replied
by texting DEL REAL "Ay boy" which translates "On my way."
Investigators believe that when DEL REAL says "the car is ready
if you want to come" he is referring to methamphetamine being
ready for CS #1 to purchase. The texts following that comment
were CS #1 and DEL REAL arranging a time and place to complete
the purchase of methamphetamine. DEL REAL used 620-253-9565 to
coordinate the sale of methamphetamine via text message.

     21.    On December 17, 2018, CS #1 met with investigators
in a predetermined location in preparation for another
controlled purchase of methamphetamine from Danny DEL REAL. CS
#1 and CS #1's vehicle were searched for contraband and large
amounts of currency and none were found. CS #1 was provided with
$2,800.00 in U.S. currency to purchase 1/2 pound of
methamphetamine. Investigators followed CS #1 to 1207 W. Trail
Street Dodge City, Kansas. CS #1 entered the residence and met

with DEL REAL. DEL REAL confirmed CS #1 wanted eight ounces and weighed out the methamphetamine on a digital scale. DEL REAL gave CS #1 the methamphetamine and CS #1 gave DEL REAL $2,500.00. CS #1 exited the residence and was followed back to a predetermined location by investigators. CS #1 gave investigators the methamphetamine and $300.00 in U.S. currency that was not expended. CS #1 and CS #1's vehicle were searched again for contraband and large amounts of currency and again none were found. The methamphetamine field tested positive for the presence of methamphetamine. Lab test results are pending.

22.    On January 18, 2019, CS #1 met with investigators in a predetermined location in preparation for another controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $5,000.00 in U.S. currency to purchase one (1) pound of methamphetamine. CS #1 was given an electronic recording device. Investigators followed CS #1 to 1207 W. Trail Street Dodge City, Kansas. CS #1 called 620-253-9565 and spoke to DEL REAL. DEL REAL told CS #1 to go to Import Automotive. CS #1 was followed by investigators to Import Automotive. CS #1 met with DEL REAL and went inside the shop. CS #1 provided DEL REAL with the $5,000.00 in U.S. currency. DEL REAL went to a car located in the paint bay of the

25

dealership and removed the methamphetamine from the front passenger seat of the vehicle. DEL REAL provided CS #1 with the methamphetamine. CS #1 exited the shop and was followed back to a predetermined location by investigators. CS #1 gave investigators the methamphetamine. CS #1 and CS #1's vehicle were searched again for contraband and large amounts of currency and again none were found. The methamphetamine field tested positive for the presence of methamphetamine. Lab test results are pending.

23.    On January 29, 2019, investigators conducted a debriefing of SOI #1. SOI #1 stated s/he knows Danny DEL REAL to be a major methamphetamine distributor in Dodge City, Kansas. SOI #1 said that s/he used to sell methamphetamine for DEL REAL in Dodge City, Kansas, and at one point sold enough to send $125,000 U.S. currency to Mexico in less than three months. SOI #1 admitted to selling two to five pounds a week for DEL REAL. SOI #1 stated that this occurred several years ago. SOI #1 stated that LDR is in charge of the family. SOI #1 has never seen LDR with methamphetamine but is confident that he directs the drug trade. SOI #1 stated that the DEL REAL family uses car auctions to move methamphetamine.

24.    On February 26, 2019, CS #1 met with investigators in a predetermined location in preparation for another

controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $2,800.00 in U.S. currency to purchase 1/2 pound of methamphetamine. CS #1 was given an electronic recording device. Investigators followed CS #1 to DEL REAL's residence located at 1207 W. Trail Street Dodge City, Kansas. Moments later, DEL REAL arrived at the residence in a maroon Dodge Ram four door truck. DEL REAL and CS #1 walked to a shed behind the house and went inside. DEL REAL removed a board from the ceiling using a power tool and removed approximately two ounces of methamphetamine which he gave to CS #1. DEL REAL said the rest of the methamphetamine was at Import Automotive and told CS #1 to meet him at the shop. Investigators followed CS #1 and DEL REAL to Import Automotive and watched both go inside. DEL REAL asked for the two ounces of methamphetamine back so he could weigh all of the drugs together. CS #1 gave the two ounces back to DEL REAL. LDR entered the shop and began talking to CS #1 and to Danny DEL REAL. Danny DEL REAL did not sell CS #1 the methamphetamine in front of his father and the purchase was terminated. CS #1 was followed back to a predetermined location by investigators. CS #1 returned the $2,800.00 in buy funds. CS #1 and CS #1's

vehicle were searched for contraband and large amounts of currency and none were found.

25.     On February 28, 2019, CS #1 met with investigators in a predetermined location in preparation for another controlled purchase of methamphetamine from Danny DEL REAL. CS #1 and CS #1's vehicle were searched for contraband and large amounts of currency and none were found. CS #1 was provided with $2,800.00 in U.S. currency to purchase 1/2 pound of methamphetamine. CS #1 was given an electronic recording device. Investigators followed CS #1 to Import Automotive located at 100 N. Second Street, Dodge City, Kansas. CS #1 spoke to DEL REAL in the office of the business and provided him with $2,500.00 in U.S. currency. DEL REAL gave CS #1 a set of car keys and told him/her the drugs were located in a car in front of CS #1's residence. CS #1 was followed by surveillance units back to a predetermined location. Surveillance was established on CS #1's residence and reported seeing a Nissan Altima parked on the street unoccupied. CS #1 was followed by surveillance units to his/her residence. CS #1 exited his/her vehicle and got into an unoccupied grey Nissan Altima bearing Kansas tag 690 LSR that was parked in the street. CS #1 tried calling DEL REAL several times while s/he was in the Altima but the calls did not connect. CS #1 exited moments later and got into his/her

28

vehicle. Surveillance units observed CS #1 exiting the Altima with a package. CS #1 was followed back to a predetermined location by surveillance units. CS #1 gave investigators an auto parts box containing methamphetamine. CS #1 returned $300 in U.S. currency that was not used and was searched for contraband and large amounts of currency. None were found. CS #1's vehicle was searched for contraband and large amounts of currency and none were found. CS #1 stated during a debrief that the drugs were located in the auto parts box on the back seat floorboard of the grey Nissan Altima. The methamphetamine was field tested by KBI Special Agent Matt Lyon. The methamphetamine field tested positive for the presence of methamphetamine. Lab test results are pending.

26.     On March 04, 2019, your Affiant received information from Western Union regarding money order transactions completed by IM. The information was provided in response to an administrative subpoena. The records revealed IM completed money order transfers to Mexico on December 31, 2018, January 18, 2019, and February 10, 2019. Each time, IM provided phone number 501-690-8659. Each transaction was for $1,000.00 U.S. currency. 501-690-8659 is a frequent contact on DEL REAL's tolls. Det. Thompson reviewed video of the February 10, 2019 Western Union transaction which was maintained by a local business and

confirmed that IM completed the transaction. Your Affiant issued

an administrative subpoena to Cellco Partnership d/b/a Verizon

Wireless for phone tolls on phone number 501-690-8659. Your

Affiant received and reviewed tolls for phone number 501-690-

8659 for the time frame of January 20, 2019 to February 18,

2019. Your Affiant also had tolls for 501-690-8659 for the time

frame of January 5, 2019 to February 3, 2019. This allowed

investigators to review tolls for phone number 501-690-8659 from

January 5, 2019 to February 18, 2019 which covers the time of

two wire transfers sent by IM. During that time frame, 501-690-

8659 was not in contact with any Mexico phone numbers.  Your

Affiant believes IM would be in phone contact with family

members or friends if the money he is sending was intended for

family members or friends. Investigators have no information on

IM having family in Mexico. Based on your Affiants training and

experience as well as knowledge gleaned from other agents, your

Affiant knows that sending wire transfers to Mexico is a common

way to launder money and pay for narcotics.

27.    On May 09, 2019, investigators met with CS #1 in a

predetermined location in Dodge City, Kansas, in preparation for

a controlled purchase of methamphetamine from Danny DEL REAL. CS

#1 was interviewed before the attempted buy. CS #1 told

investigators that s/he went to Import Automotive on May 08,

30

2019, at approximately 1:50 pm., and spoke with Danny DEL REAL about purchasing methamphetamine on May 09, 2019. CS #1 stated that DEL REAL began a text conversation with an unknown individual. Following the text conversation, DEL REAL told CS #1 the drugs would be ready for purchase on May 09, 2019.

28.     On July 30, 2019, CS #1 met investigators at a predetermined location in Dodge City, KS in preparation for a controlled purchase of methamphetamine from Danny DEL REAL. The CS and the CS's vehicle were searched for contraband and large amounts of currency and none were found. Investigators gave the CS an electronic recording device and $5,000.00 U.S. currency. CS #1 was followed by surveillance units to Import Automotive located at 100 N. 2nd Street Dodge City, KS (owned by Danny DEL REAL). CS #1 met DEL REAL inside the shop and spoke with DEL REAL. DEL REAL told CS #1 to meet him (DEL REAL) at the Farmers Market in Dodge City, KS. The CS was followed to the Farmers Market located at 1800 Central Ave. Dodge City, KS. DEL REAL arrived at the Farmers Market and met with the CS. DEL REAL told the CS to follow him (DEL REAL) to the area of 2nd and Hickory Dodge City, KS. DEL REAL told CS #1 the methamphetamine was in a vehicle parked at that location. The CS followed DEL REAL to that location. The CS got out of his/her vehicle and entered a gray four door car parked in the street. Moments later the CS

31

got out of the car with a white bag. DEL REAL drove away. A male known to the CS as "CABALLO" approached the gray car and engaged the CS in conversation. CS #1 knew CABALLO worked for Danny DEL REAL at Import Automotive. CABALLO said he was responsible for the gray car. CS #1 followed CABALLO to a library parking lot where the CS gave CABALLO the $5,000.00 for the methamphetamine. CS #1 returned to a predetermined location to meet with investigators. CS #1 gave investigators approximately one pound of methamphetamine which s/he retrieved from under the back seat of the gray car. The CS and the CS's vehicle were searched for contraband and large amounts of currency and again none were found.

29.    CS #1 used an electronic recording device on all controlled purchases and attempted purchases of methamphetamine from DEL REAL. CS #1 would customarily arrange these deals in person days prior to the actual deal. During the controlled purchases, CS #1 made phone calls to 620-253-9565 for the purpose of coordinating narcotics transactions as they happened. When DEL REAL answered the phone, only the CS's side of the conversation was recorded due to the fact CS #1 was at or near the location of the drug deal. Investigators have verified these conversations between CS #1 and DEL REAL through CS #1's

32

statements, pen register data, toll data, and photographs of CS #1's call logs.

30.   On September 20, 2019, the Honorable Judge Gwynne E. Birzer signed a document search warrant for 1207 W. Trail Dodge City, KS and a search warrant for cell phones found in Danny DEL REAL's possession. On September 23, 2019, the KBI High Risk Warrant Team executed the search warrant at 1207 W. Trail St. During a subsequent search of the residence, investigators located a black Samsung cell phone on the floor of Danny DEL REAL's bedroom. The back cover of the phone, which usually contains identifying information, had been removed. Investigators suspect the Device is assigned phone number 620-253-9565 and has been used to further drug trafficking. It will be necessary for investigators to open the Device to verify the phone number and IMEI.

31.   The Device is currently in storage at the DEA Wichita Resident Office. I seek this warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

**TECHNICAL TERMS**

32.   Based on my training and experience, I use the following technical terms to convey the following meanings:

33

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

34

33.   Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

35.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a
   file that was once on the storage medium but has since
   been deleted or edited, or of a deleted portion of a
   file (such as a paragraph that has been deleted from a
   word processing file).

b. Forensic evidence on a device can also indicate who
   has used or controlled the device.  This "user
   attribution" evidence is analogous to the search for
   "indicia of occupancy" while executing a search
   warrant at a residence.

c. A person with appropriate familiarity with how an
   electronic device works may, after examining this
   forensic evidence in its proper context, be able to
   draw conclusions about how electronic devices were
   used, the purpose of their use, who used them, and
   when.

d. The process of identifying the exact electronically
   stored information on a storage medium that is
   necessary to draw an accurate conclusion is a dynamic
   process.  Electronic evidence is not always data that
   can be merely reviewed by a review team and passed
   along to investigators.  Whether data stored on a

36

computer is evidence may depend on other information

stored on the computer and the application of

knowledge about how a computer behaves.  Therefore,

contextual information necessary to understand other

evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used,

the purpose of its use, who used it, and when,

sometimes it is necessary to establish that a

particular thing is not present on a storage medium.

36.  *Nature of examination.*  Based on the foregoing, and
consistent with Rule 41(e)(2)(B), the warrant I am applying for
would permit the examination of the device consistent with the
warrant.  The examination may require authorities to employ
techniques, including but not limited to computer-assisted scans
of the entire medium, that might expose many parts of the device
to human inspection in order to determine whether it is evidence
described by the warrant.

37.  *Manner of execution.*  Because this warrant seeks only
permission to examine a device that would already be in law
enforcement's possession, the execution of this warrant does not
involve the physical intrusion onto a premises.  Consequently, I

37

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

38.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Jacob Seibel
Special Agent
DEA

Subscribed and sworn to before me
on September 27, 2019:

HONORABLE GWYNNE E. BIRZER
UNITED STATES MAGISTRATE JUDGE

38

## ATTACHMENT A

The property to be searched is a cell phone located on the floor of Danny DEL REAL's bedroom at 1207 W. Trail St. Dodge City, KS. The Device is a black Samsung cell phone in a blue case. The back cover of the phone, which usually contains identifying information, had been removed. Investigators suspect the Device is assigned phone number 620-253-9565 and has been used to further drug trafficking. It will be necessary for investigators to open the Device to verify the phone number and IMEI.


This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.    All records on the Device described in Attachment A
that relate to violations of  the Controlled Substances Act,
including Title 21, United States Code, sections 841 (Possession
with Intent to Distribute, and Distribution of, Controlled
Substances), 843 (Unlawful Use of a Communication Device in
Connection with Drug Trafficking), and 846 (Conspiracy to
Possess and to Distribute Controlled Substances) and involve
Danny DEL REAL since September 11, 2018, including:

      a. lists of customers and related identifying
         information;

      b. types, amounts, and prices of drugs trafficked as well
         as dates, places, and amounts of specific
         transactions;

      c. any information related to sources of drugs (including
         but not limited to the names, addresses, phone
         numbers, or any other identifying information who may
         be supplying or transporting drugs);

      d. any information recording DEL REAL's schedule or
         travel from September 11, 2018, to the present;

      e. all bank records, checks, credit card bills, account
         information, and other financial records.

f. Photos of drugs, guns, etc

g. Text messages, email

h. Information regarding Whatsap

2.   Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2